# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

SARA A.S.,

              Plaintiff,

v.

ANDREW M. SAUL,
Commissioner of Social Security,[1]

              Defendant.

Case No. 19-cv-1293 (JNE/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Plaintiff Sara A.S.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 16) and Defendant Commissioner of Social Security Andrew Saul's ("Defendant") Motion for Summary Judgment (Dkt. 18). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits. This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Plaintiff's Motion be denied, and Defendant's Cross-Motion be granted.

---

[1] The current Commissioner of Social Security Andrew Saul is substituted for former Acting Commissioner Nancy Berryhill, because a "[public] officer's successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

# I.    BACKGROUND

On March 21, 2016, Plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act alleging disability as of January 15, 2012.[2]  (R. 187-189.)  Her application was denied initially and on reconsideration.  (R. 94, 112.) Plaintiff filed a written request for a hearing, and on September 26, 2018, Plaintiff appeared and testified at a hearing before Administrative Law Judge Micah Pharris ("ALJ").  (R. 10.)

The ALJ issued an unfavorable decision on November 15, 2018, finding that Plaintiff was not disabled.  (R. 10-24.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[3] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date of January 15, 2012 through the date last insured of December 31, 2016.  (R. 12.)

---

[2]    The Social Security Administrative Record ("R.") is available at Dkt. 9.

[3]    The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

At step two, the ALJ determined that Plaintiff had the following severe impairments: multiple sclerosis; remitted breast cancer status post chemotherapy with ongoing neuropathic pain; and cognitive disorder related to multiple sclerosis or history of chemotherapy or both.  (R. 12.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 13.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform a range of work at a "light" level of exertion, as defined in 20 CFR 404.1567(b), subject to all of the following additional limitations: limited to simple routine tasks at a nonproduction pace -- when I refer to nonproduction pace I do not mean that daily quotas could not exist, but rather that the work cannot occur in an assembly line type environment, where there would be hourly or similarly tracked production quotas.

(R. 17.)

The ALJ concluded that based on the above RFC, Plaintiff was unable to perform her past work as an auditor, but that she was capable of performing work as a merchandise marker (DOT code 209.587-034), cashier II (DOT code 211.462-010), and router (DOT code 222.587-038).  (R. 22-23.)  Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 23.)

Plaintiff requested review of the decision.  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-3.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.

## II.      RELEVANT RECORD

### A.    Medical Record

On January 3, 2012, Plaintiff reported that she was having trouble seeing out of her left eye, which an ophthalmologist believed was related to her optic nerve.  (R. 393.) She had also been experiencing pain and numbness in her lower extremities.  (R. 393.)

On February 7, 2012, Plaintiff saw Gary Beaver, D.O., related to a diagnosis of multiple sclerosis ("MS").  (R. 817.)  Plaintiff had experienced an abrupt onset of some numbness and burning in her right foot spreading up to her rib in June 2011.  (R. 817.) Her medical provider believed it was due to an overactive nervous system.  (R. 817.) These symptoms persisted, and January 1, 2012, Plaintiff awoke and noticed she was having a cecocentral scotoma in her left eye.  (R. 817.)  It was determined that Plaintiff had had junctional neuritis.  (R. 817.)  An MRI was performed on her spine and plaques were discovered.  (R. 817.)  An imaging study of Plaintiff's brain was unremarkable.  (R. 817.)  Plaintiff was still experiencing tingling in her right foot, but she denied at any point having weakness or coordination difficulties.  (R. 817.)  Walking was never affected.  (R. 817.)  Plaintiff reported feeling well.  (R. 817.)  The review of Plaintiff's symptoms was negative except for some joint discomfort, fatigue, and tingling in her right foot.  (R. 818.)  The physical examination showed normal strength and sensation in her extremities with no pronator drift.  (R. 818.)  Her sensory examination was intact temperature and

4

vibratory sense in all extremities.  (R. 818.)  Her gait was unremarkable and Romberg[4]

was absent.  (R. 818.)  Dr. Beaver diagnosed Plaintiff with remitting multiple sclerosis.

(R. 819.)  Dr. Beaver noted that "patient's presentation of vision and sensory would

portend a favorable prognosis; however, as I stated does have a significant amount of

disease burden within the spinal cord, although she is relatively asymptomatic from it."

(R. 818.)

As of March 1, 2012, Plaintiff showed "substantial improvement" in her vision,

and her visual acuity was at 20/40 in the left eye.  (R. 452.)  Plaintiff was starting on

Redif for her MS.  (R. 452.)

In March 2012, Plaintiff traveled to Mexico for vacation.  (R. 314.)

Plaintiff exhibited a mild antalgic gait[5] at her physical therapy sessions during a

limited period between August 2012 to December 2012.  (R. 662, 665, 668, 671, 674,

677, 680.)

On July 25, 2012, Plaintiff was seen by Erin Holker, Ph.D., for a

neuropsychological evaluation, during which time she professed that she had recently had

a mild relapse of her MS, and had received steroids, which provided Plaintiff with some

improvement.  (R. 328.)  She had been referred to Dr. Holker by Dr. Beaver for further

characterization of any cognitive difficulties.  (R. 328.)  Plaintiff also noted a history of

---

[4]     Romberg sign: "When a patient, standing with feet approximated, becomes
unsteady or much more unsteady with eyes closed. STEADMAN'S MEDICAL DICTIONARY,
1771 (28th ed. 2006).

[5]     Antalgic Gait: "Resulting from pain on weight-bearing in which stance phase . . .
is shortened on the affected side." STEADMAN'S MEDICAL DICTIONARY, 781 (28th ed.
2006).

significant issues with fatigue. (R. 328.) Plaintiff's energy level was lower than normal, and she had been experiencing more fatigue with the heat. (R. 328.) She had been taking 20-minute naps each day. (R. 328.) Plaintiff represented that she had worked as a director of audit and compliance, and then did consulting in internal auditing. (R. 329.) She had been off of work since June 2011. (R. 329.) She had been working part-time, but was working more hours than she wanted to, and felt that if she was going to work that hard, she would take a job that was at a higher level like she used to have. (R. 57-58, 329.) She noticed that just after she quit work, she had burning in her feet and on January 1, 2012, she developed optic neuritis, which ultimately led to her diagnosis of MS. (R. 329.) Plaintiff had planned to go back to work, but felt that she would not be able to work even in her part-time job, and was considering applying for disability at some point. (R. 329.) While Plaintiff noted numbness, tingling, and burning on her right side in her lower leg and foot, she claimed that her balance and coordination had generally been good. (R. 329.) During her testing, Plaintiff's intelligence functioning was estimated to be in the high average range and her overall attention span, including her sustained attention, was average. (R. 330.) Psychomotor processing speed was above average. (R. 330.) Finger tapping speed fell at the high end of the average range in her right, dominant hand, and was average in her left hand. (R. 330.) Fine manual dexterity was high average in her right hand, and average in her left hand. (R. 330.) Her construction of complex designs was moderately impaired for her age, and was characterized primarily by difficulty with planning and organization. (R. 330.) She worked quickly on this task. (R. 330.) Assembly of visual material was average. (R. 330.) Visual problem

solving was above average.  (R. 330.)  Novel problem solving, including the ability to generate strategies and solutions, was moderately impaired for her age and level of education.  (R. 330.)  Immediate recall of verbal narrative material was high average, with an above average recall following a 30-minute delay.  (R. 330.)  On a multiple trial list learning task, immediate recall was above average, with high average recall following a 20-minute delay.  (R. 330.)  Recognition memory on this task was high average.  (R. 330.)  Immediate recall of visual material was moderately impaired, with moderately impaired recall following a 30-minute delay; notably, qualitative review of her drawings indicated that she recalled more information after 30 minutes than she did with immediate recall.  (R. 330.)  Recognition memory on this task was average.  (R. 330.)  Her motor function fell within normal limits bilaterally.  (R. 331.)  In sum, Dr. Holker found that Plaintiff's results indicated a moderate executive dysfunction, including difficulty with problem solving, conceptualization, and perseveration.  (R. 331.)  In terms of daily functioning, Plaintiff was likely to have significant difficulty managing large, complex tasks.  (R. 331.)  She was likely to have difficulty organizing large amounts of information, prioritizing tasks, and sequencing her actions.  (R. 331.)  Dr. Holker found that Plaintiff might benefit from structure and routine and if she had difficulty organizing large, complex tasks, others might assist by breaking down such tasks into smaller, more manageable parts.  (R. 331.)

On April 10, 2012, Plaintiff reported recent right arm numbness and numbness to back of head that had been occurring since April 6, 2012.  (R. 406.)  On April 12, 2012, Plaintiff saw Dr. Beaver with reports of tingling in her head followed by difficulty with

7

writing.  (R. 812.)  She also reported feeing lightheaded and dizzy with these episodes, but claimed that she could still do crossword puzzles.  (R. 812.)  Her examination showed that she had normal motor strength and an unremarkable gait.  (R. 813.)  Dr. Beaver did not believe that Plaintiff was experiencing a relapse of MS, and that these episodes were caused by fatigue and poor sleep.  (R. 813.)

On July 12, 2012, Plaintiff was seen for a follow-up on her MS.  (R. 808.) Plaintiff represented that she was having issues with some tendon discomfort and tightness, continued to have gastrointestinal issues (which was a chronic problem with no clear etiology), was having difficulty with sustained attention, concentration, and memory, and was having significant issues with fatigue.  (R. 808.)  Plaintiff took 20-minute naps in the afternoon, which would help.  (R. 808.)  Her physical examination showed that she had normal motor strength and an unremarkable gait.  (R. 808.)  Plaintiff was placed on Ritalin.  (R. 808.)

On January 10, 2013, Plaintiff was seen for an MS recheck.  (R. 798.)  As of this date, there was no indication that Plaintiff was continuing to take Ritalin.  (R. 799.) Plaintiff claimed to be experiencing numbness with no falls or tripping.  (R. 798.) Plaintiff professed to doing well.  (R. 799.)  Her physical examination showed that she had normal motor strength with no pronator drift and an unremarkable gait.  (R. 799.)

On May 14, 2013, Plaintiff had another re-check of her MS.  (R. 794.)  Plaintiff claimed to be experiencing numbness with no falls or tripping.  (R. 794.)  Plaintiff professed to doing well.  (R. 795.)  She noted bouts of fatigue occurring twice a week

requiring her to sleep.  (R. 795.)  Her physical examination showed that she had normal motor strength and an unremarkable gait.  (R. 795.)

On June 3, 2013, Plaintiff noted to a nurse over the telephone that her right foot was tight and that she was having trouble walking on the right foot.  (R. 793.)  Plaintiff noted that she was willing to engage in physical therapy and to discuss medication options.  (R. 793.)

On November 2, 2013, Plaintiff again saw Dr. Beaver for a re-check of her MS. (R. 792.)  Plaintiff claimed she was doing well overall and that her biggest issue was fatigue and some muscle discomfort.  (R. 792.)  Plaintiff claimed that she slept well at night, but did not feel rested when she woke up and felt very tired.  (R. 792.) Occasionally, she took naps lasting about 15 minutes during the afternoon.  (R. 792.) Plaintiff's strength was intact, and her gait was unremarkable.  (R. 792.)  Dr. Beaver put Plaintiff on a stimulating antidepressant, Fluoxetine, for her fatigue.  (R. 792.)

Dr. Beaver noted that Plaintiff's MRI for MS was stable, but that she had been recently diagnosed with breast cancer.  (R. 785-86.)  Plaintiff was tolerating the chemotherapy well.  (R. 786.)  Overall, Plaintiff represented that she felt she was doing "pretty well."  (R. 786.)  She noted that she was experiencing fatigue.  (R. 786.)  She noted that neurologically she had remained stable and that she had no other new issues or concerns.  (R. 786.)  Dr. Beaver's examination of Plaintiff showed that her strength was normal, and her gait was unremarkable.  (R. 786.)

On April 25, 2013, Plaintiff filled out a questionnaire for her physical therapist. (R. 684.)  Plaintiff represented that she had no limitations with respect to sitting,

9

standing, walking, or performing repetitive tasks.  (R. 684.)  Her only limitations related to sleeping and lying down due to headaches.  (R. 684.)

On June 6, 2013, Plaintiff sought physical therapy for ankle and achilleas weakness due to MS spasticity, which she claimed affected her ability to walk and squat. (R. 719.)  Her goal was to be able to walk her dog.  (R. 720.)  As of June 17, 2013, Plaintiff represented that she had been improving but was sore after a longer walk.  (R. 728.)  As of July 17, 2013, Plaintiff had made good progress and was told that she could benefit from physical therapy for future exacerbations.  (R. 734.)

During an April 23, 2014 preoperative examination, Mary Ezzo, M.D., found Plaintiff's MS to be stable, and that she had normal hand strength and gait, despite Plaintiff claiming numbness in her right foot and loss of executive functioning.  (R. 415-16.)  Plaintiff claimed that her last MS relapse occurred in April 2012.  (R. 415.)

On April 24, 2014, Plaintiff was seen for a MS follow-up.  (R. 787.)  Plaintiff noted numbness, but no tripping or falls.  (R. 788.)  The patient claimed that she was doing well overall. (R. 788.)  She was having issues with fatigue.  (R. 788.)  The fluoxetine was not helpful, as she claimed that she was "just wiped out" by 2:00 p.m. every day.  (R. 788.)  She noted that she was sleeping much better at night.  (R. 788.) Her examination showed normal strength in her extremities and an unremarkable gait. (R. 789.)  Dr. Beaver started Plaintiff on amantadine 100 mg in morning and at noon to see if this would help Plaintiff with her fatigue.  (R. 789.)  Plaintiff was to call Dr. Beaver if the amantadine was not working to see about starting her on stimulants.  (R. 789.)

On June 17, 2014, Plaintiff denied any musculoskeletal; immunological, or neurological problems to Richard Glasow, M.D. (R. 422.) Plaintiff's foot, musculoskeletal, psychiatric, and neurological examinations were all normal. (R. 423.)

It was noted in a July 21, 2014 telephone encounter with medical providers that Plaintiff's MS was in remission. (R. 786.)

On August 5, 2014, Plaintiff again saw Dr. Beaver for a re-check of her MS. (R. 785.) Dr. Beaver noted that her MRI for MS was stable, but that she had been diagnosed with breast cancer. (R. 758-86.) Plaintiff was tolerating the chemotherapy well. (R. 786.) Plaintiff represented that she felt she was doing "pretty well." (R. 786.) She noted that she was experiencing fatigue. (R. 786.) Plaintiff also represented that she had remained stable neurologically and that she had no other new issues or concerns. (R. 786.) Dr. Beaver's examination of Plaintiff showed that her strength was normal, and her gait was unremarkable. (R. 786.)

On December 11, 2014, Plaintiff saw Dr. Beaver for another re-check regarding her MS. (R. 782.) Plaintiff noted numbness, but no tripping or falls. (R. 783.) Plaintiff had just received her last round of chemotherapy for her breast cancer, which had been diagnosed in June 2014. (R. 346, 783.) Plaintiff asserted that she tolerated the chemotherapy well, but experienced neuropathy problems. (R. 783.) Plaintiff felt that she had not experienced any new symptoms related to her MS. (R. 783.) She did note that she had a "little bit more issues with regards to fatigue." (R. 783.) She had no other concerns. (R. 783.) Her examination showed that she had 5/5 strength in all extremities

with no pronator drift. (R. 783.) Reflexes could not be elicited in the lower extremities. (R. 783.) Dr. Beaver found Plaintiff's MS to be stable. (R. 784.)

On January 19, 2015, Plaintiff denied any musculoskeletal, immunological, or neurological problems to Dr. Glasow. (R. 429.) Her foot, musculoskeletal, and neurological examinations were all normal. (R. 430.)

On March 17, 2015, Plaintiff complained of numbness in her feet, but did not have any incidents of tripping or falls. (R. 780-81.) She was seen related to her MS. (R. 781.) According to Dr. Beaver:

> The patient states overall she is doing well. She has no new issues or concerns. She still is having problems with the neuropathic discomfort that she is having due to her chemotherapy-induced polyneuropathy on top of her MS. The patient did have an MRI of the brain done today, which I have reviewed and is normal. Previously enhancing lesions have resolved. She states she is otherwise doing well. She has no new issues or concerns.

(R. 781.)

On April 10, 2015, Plaintiff again denied any musculoskeletal, immunological, or neurological problems to Dr. Glasow. (R. 437.) She also denied any general constitutional problems. (R. 437.) Her exam showed that her foot, musculoskeletal, and neurological examinations were all normal. (R. 437-38.)

On September 2, 2015, Plaintiff filled out an assessment form for physical therapy related to side and back pain. (R. 736.) In a listing of her limitations, Plaintiff only noted limitations with respect to reaching, sleeping on her side, and certain unspecified home activities. (R. 736.) There were no limitations with respect to her ability to sit, stand, walk, or engage in repetitive activities. (R. 736.)

On October 22, 2015, Plaintiff had an MRI showing no changes, no active demyelination, or lesions with respect to her MS. (R. 550-52.)

On October 26, 2015, Plaintiff was seen with complaints of a tight eye with some pain. (R. 468.) She did not report a vision change and denied the offer of steroids given. (R. 468.) Plaintiff's musculoskeletal and neurological systems were all normal. (R. 468-69.)

On January 12, 2016, Plaintiff was seen for a follow-up with Dr. Beaver. (R. 476.) It was noted that Plaintiff made the decision to not be on any disease-modifying therapy. (R. 476.) She did have an MRI of her brain done in October 2015 that was stable with no new lesions and no enhancing activity. (R. 476, 478.) Plaintiff represented that "overall she has been doing well." (R. 476, 776.) She asserted that she had issues with her cognitive dysfunction and had difficulty with trying to organize things. (R. 476.) Plaintiff claimed to be having issues with pain, but difficulty tolerating any medication to use for the pain. (R. 476, 776.) The physical examination of Plaintiff showed that she was in no apparent distress, her strength was 5/5 in all extremities with no drift, and her gait was unremarkable. (R. 476, 776.)

On June 7, 2016, Plaintiff had a psychological evaluation performed by psychologist John O'Regan, Ph.D., with the Minnesota Disability Determination Service. (R. 971.) Plaintiff noted that she was not taking any medications. (R. 972.) It was also noted that Dr. Beaver had diagnosed Plaintiff with cognitive dysfunction. (R. 972.) Plaintiff represented to Dr. O'Regan that she had a new puppy that she spent time caring for and walking. (R. 972.) She visited her mother on a regular basis and liked to go

13

shopping, but it was hard for her to make extensive shopping lists.  (R. 972.)  She

represented that she could not read like she used to and would forget what she read.  (R.

972.)  Plaintiff also claimed that when she participated in social events, she would

socialize like she was drunk—feeling tipsy and stimulated by the social stimuli.  (R. 972.)

According to Dr. O'Regan, Plaintiff showed mild cognitive dysfunction probably due to

her relapsing MS and diagnosed her with a mild neurocognitive disorder.  (R. 975.)  Dr.

O'Regan also opined as follows:

> Based on her current social and emotional functioning, she has the mental
> capacity to understand, remember, and follow only simple instructions.  Her
> capacity to sustain attention and concentration is mildly impaired as a result
> of her medical condition.  Thus, she would have difficulty carrying out work-
> like tasks with reasonable pace and persistence.  She would not have
> difficulty responding appropriately to brief and superficial contacts with
> coworkers, supervisors and the public.
>
> It is this examiner's opinion that she would not be able to tolerate the stress
> and pressure typically found in the entry level workplace.

(R. 975-76.)

On June 20, 2016, Plaintiff left a voicemail with her providers letting them know

of symptoms with respect to her walking and her feet.  (R. 985.)  When she was called

back, she noted itching and spasticity.  (R. 985.)  Plaintiff also talked about her disability

having been denied and that she was going to appeal the decision.  (R. 986.)  Plaintiff

talked about having another neurophysiological evaluation to see if it could help with her

disability approval.  (R. 986.)  Plaintiff was going to let Dr. Beaver known how the anti-

itching medication was working, and would send over the disability denial letter to Dr.

Beaver.  (R. 986.)  It was noted that Plaintiff had no further needs.  (R. 986.)

On July 12, 2016, Plaintiff filled out a health information form for her physical therapist. (R. 993.) She claimed she needed therapy for falling and spasticity. (R. 993.) Plaintiff claimed she had had five falls over the past year. (R. 994.) Plaintiff noted that she had been exercising on a daily bias. (R. 994.) Her goal for therapy was increased stability. (R. 993.) As of June 20, 2016, Plaintiff reported doing better and even "hiked up north." (R. 1002.) On July 27, 2016, Plaintiff again asserted that she was doing better but claimed to have some posterior tibia tendon pain, which she later reported on August 3, 2016 was improved. (R. 1005-08.)

Plaintiff was seen for an additional neurophysiological examination on July 14, 2016. (R. 980.) Plaintiff felt that her cognition had been progressively getting worse since her chemotherapy. (R. 981.) She noticed that she had greater difficulty with word finding and needed to run through words out loud until she found the right one, when in the past she was able to do that silently. (R. 981.) She had some difficulty understanding what others were saying. (R. 981.) She felt that her short-term memory was not as good as it used to be, and she sometimes had trouble remembering what others had said. (R. 981.) She denied difficulty remembering names of familiar people, becoming lost in familiar places, or misplacing items any more than normal. (R. 981.) Her husband indicated that she was not repeating questions or stories. (R. 981.) She noticed difficulty with attention and concentration. (R. 981.) She used to read voraciously, but could no longer read because of her difficulty paying attention. (R. 981.) She also fell asleep during movies and no longer enjoyed them. (R. 981.) She noticed difficulty with decision-making, and felt a lot less organized. (R. 981.) She did not like being in large

15

places or with large groups of people because she could not follow conversations, and she felt drunk much of the time. (R. 981.) Plaintiff's testing showed that that her intellectual functioning was estimated to fall in the above average range. (R. 982.) Plaintiff's attention was variable. (R. 982.) Attention span was mildly impaired for her age. (R. 982.) Divided attention was average. (R. 982.) Performance on a measure of distractibility was average. (R. 982.) Psychomotor processing speed was average. (R. 982.) Finger tapping speed was moderately impaired bilaterally. (R. 982.) Fine manual dexterity was average in her right, dominant hand, and mildly impaired in her left hand. (R. 982.) Construction of a complex design was moderately impaired, and was notable for difficulty with planning and organization. (R. 982.) Assembly of visual materials was in the high average range. (R. 982.) Visual problem-solving was above average. (R. 982.) Novel problem-solving, including the ability to generate strategies and solutions, was mildly impaired. (R. 982.) Immediate recall of verbal narrative material was above average, with high average recall following a 30-minute delay. (R. 982.) On a multiple trial list learning task, immediate recall was average, with mildly impaired recall following a 20-minute delay. (R. 982.) Recognition memory on this task, however, was average. (R. 982.) Immediate and 30-minute delayed recall of visual material was moderately impaired, with mildly impaired recognition memory on this task. (R. 982.) In sum, the results of the examination were indicative of mild executive dysfunction, including impairments to problem solving, perseverations, conceptualization, planning, and organization. (R. 982.) Dr. Holker opined that Plaintiff may have difficulty managing large, complex tasks, and others may need to assist her by

breaking down such tasks into smaller, more manageable parts.  (R. 982.)  Dr. Holker

also found that Plaintiff would likely benefit from structure and routine and that given her

variable attention, she may find it helpful to complete one task before beginning another,

she could find it helpful to work in environments that are relatively free from distractions,

such as noises or other interruptions, she may process information best when it is

presented in context, and was likely to benefit from written reminders.  (R. 982-83.)  Dr.

Holker also found that others might also assist Plaintiff by providing her with written

information whenever possible.  (R. 983.)

On August 18, 2016, it was reported by Plaintiff's physical therapist that Plaintiff

had improved her walking tolerance and pattern.  (R. 1015.)

On September 19, 2016, Plaintiff saw Dr. Beaver for an MS re-check.  (R. 1022.)

Plaintiff reported that her cognitive issues were the major problem.  (R. 1022.)  Plaintiff

claimed that she had difficulty sustaining attention, concentration, retaining information,

and difficulty reading.  (R. 1022.)  Plaintiff also asserted that the pain in her feet was

better on the outside, but still present on the inside, and that her spasticity was better with

the physical therapy.  (R. 1022.)  The physical examination showed that Plaintiff had

normal strength in her extremities and an unremarkable gait.  (R. 1022.)  Dr. Beaver

noted that an MRI of her brain was done in September 2016, which was stable with no

new lesions and no enhancing activity.  (R. 1022.)  The plan was to follow-up in six

months.  (R. 1022.)

**B.      Plaintiff's Testimony Before the ALJ**

At the hearing before the ALJ, Plaintiff testified that she has a difficult time sustaining any type of concentration for long periods of time.  (R. 39-40.)  This included her claims that she could not read a recipe and apply it without referring back to it repeatedly.  (R. 40.)  Plaintiff also claimed that she could not follow a plot on television show or sporting event and remember what happened; while she is able to drive within a limited radius she forgets why she is going there; she relies on her calendar, notes and alarms on her phone; and she would have no recollection of what occurred when there is a lot going on.  (R. 40-42.)

In addition, Plaintiff testified that she suffers from fatigue affecting both her mental and physical energy to the extent that she cannot take anything in and cannot give anything out.  (R. 43.)  Sleep did not help with her fatigue and she testified that she usually took two naps per day from 20 minutes up to two hours.  (R. 43.)  According to Plaintiff, her fatigue made it "difficult to function in the world."  (R. 55.)

Further, Plaintiff testified that she has neuropathy in her feet and that her right foot is constantly burning with intermittent burning in her left foot.  (R. 44.)  Plaintiff claimed that the neuropathy gets worse if it is hot out, when the barometric pressure drops, when she gets overheated, or when she is tired or stressed.  (R. 46.)

Plaintiff testified that she has spasticity in her feet for which she was more recently prescribed medical cannabis, which does help with the spasticity.  (R. 45-46.)  She also testified that walking and exercising helps with her muscle spasticity.  (R. 46.)

In addition, Plaintiff testified that she is easily distracted by anything and will forget food under the broiler. (R. 47.) She claimed that she would turn on the shower and then go get dressed with the shower still running or would start a load of laundry and never remember that it is there. (R. 50-51.) Plaintiff testified that she tries to do housework, but when her body temperature starts to go up, she gets clumsier and the neuropathy gets worse. (R. 51.) Plaintiff also noted that she struggles to find the right words when speaking. (R. 51.)

Plaintiff acknowledged that she was no longer taking MS medications, and that she would not go back on the medications unless she had a major flare-up of the disease. (R. 49.)

With respect to social activities, Plaintiff noted that she would socialize with six people or less, but that she found it exhausting and noted that she would have trouble remembering. (R. 49.)

## C.     Testimony by Medical Expert

Karen Butler, Psy.D. testified as a Medical Expert during the hearing before the ALJ. (R. 63.) Dr. Butler testified that there was sufficient evidence in the record to allow her to form an opinion under Listing 12.02. (R. 64-65.) Dr. Butler testified that Plaintiff's difficulty with multitasking and managing complex information had been consistently noted back to 2012, with some reports of decline in attention, motor functioning, memory, and processing speed from 2012 to 2016, though she noted that Plaintiff's memory decline still left her with memory function that was within normal limits. (R. 65.) Dr. Butler also found that Plaintiff's memory range was, depending on

the task, from above average to moderately deficient, which from a score perspective was in the mildly deficient range. (R. 65.) Further, Dr. Butler found that Plaintiff's attention had declined, ranging from average to mildly impaired. (R. 65.) As such, Dr. Butler found that Plaintiff did not meet Listing 12.02. (R. 65.) Dr. Butler noted that aspects of her cognitive function were worse when her MS symptoms were active. (R. 65.)

The ALJ then asked Dr. Butler to evaluate the B criteria. (R. 67.) Dr. Butler testified that Plaintiff's ability to understand, remember, and apply information was moderately impaired. (R. 67.) Dr. Butler relied on Plaintiff's original neuropsychological evaluation, which noted difficulties with planning and organization, difficulties with problem solving, significant difficulty managing large complex tasks and that she would have difficulty organizing large amounts of information. (R. 67 (citing Ex. 4-F).) Dr. Butler also noted that the record supported that Plaintiff was able to remember and follow only simple instructions. (R. 67.) While Plaintiff's memory had declined, Dr. Butler found that it was still within normal limits in many cases, and that her memory score ranged from above average to moderately impaired. (R. 67.) Dr. Butler found that Plaintiff was mildly impaired as it related to her ability to interact with others. (R. 68.)

Dr. Butler further testified that Plaintiff's ability to concentrate, maintain, persistence and pace was moderately impaired. (R. 68.) Dr. Buter relied on Plaintiff's ability to care for a new puppy, and her evaluations where it was shown that her concertation was intact, as was evidenced in part by her ability to compute numbers and do basic arithmetic. (R. 68.) Dr. Butler also went on to opine as follows:

They said she had a mild impairment in her ability to sustain attention and concentration, secondary to her medical condition, and that she'd have difficulty carrying out tasks with reasonable pace and persistence.

That, Your Honor, is noted in the consultative examination at 16-F, dated 6/7, of 2016, and, at the end of that note, it says that those conclusions expire 6/30, of 2016.

At Exhibit 10-F, 17, they note lower energy, lower motivation, though average attention and average sustained attention. And at 17-F, they note declined attention and motor function and processing speed.

I said the claimant's ability to adapt and manage herself was moderately impaired. At 16-F, 6, it said she would be unable to tolerate the stress and pressure of typical entry-level work. That note is dated 6/7, of 2016, with an expiration date of 6/30/2016.

Again, Your Honor, the claimant is not really receiving any mental health treatment. The claimant is not receiving any cognitive treatment. You know, sometimes people are referred to Vineland or to Courage Center. So they note the claimant to have cognitive deficits. Again, they attribute those to the condition of her multiple sclerosis, and, from a psychological perspective, there were no notes I saw about particular memory strategies or things they were using to help the claimant either with cognitive issues or sometimes with the energy issues that can be sequelae for 12.02.

So, again, not those things necessarily aren't happening –

Q Right.

A -- but they're not -- those things are not happening provided by psychologists or psychiatrists.

Q Right. Based on your rating of the B criteria, do you think there would be work-related limitations from these kinds of impairments?

A Yes, Your Honor. I said work that would be simple and unskilled; work where there would be no rapid pace and no high production goals.

(R. 68-70.)

### III.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining

whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. §

405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec.*

*Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g);

*Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "'Substantial evidence is

less than a preponderance, but enough that a reasonable mind would find it adequate to

support the Commissioner's conclusions.'"  *Id.*  (quoting *Travis v. Astrue*, 477 F.3d 1037,

1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the

Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial

evidence supports the Commissioner's conclusions, this court does not reverse even if it

would reach a different conclusion, or merely because substantial evidence also supports

the contrary outcome."  *Id.* (citation omitted).  In reviewing the record for substantial

evidence, the Court may not substitute its own judgment or findings of fact for that of the

ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).  Assessing and

resolving credibility is a matter properly within the purview of the ALJ.  *See Chaney v.*

*Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964,

966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a

matter for the ALJ to decide.").

Plaintiff was insured through December 31, 2016 (R. 25); therefore, she must

show that her disability began before the end of her insurance period, and existed for

twelve continuous months to receive benefits.  *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

## IV.    DISCUSSION

Plaintiff makes four challenges to the ALJ's determination.  First, Plaintiff argues that the ALJ's finding that Plaintiff has the RFC to do light work is not supported by substantial evidence.  (Dkt. 17 at 12-17.)  Second, Plaintiff argues that the ALJ erred in not considering pain and fatigue in his finding that Plaintiff did not meet or equal Listing 11.09B.  (Dkt. 17 at 18-19.)  Third, Plaintiff asserts that the ALJ erred in finding that the medical expert had considered fatigue in her application of Listing 12.02 with respect to whether she met or equaled the mental impairments portion of Listing 11.09B.  (Dkt. 17 at 19-21.)  Fourth, Plaintiff argues that the ALJ erred in failing to comply with 20 C.F.R § 404.1527 by not giving proper weight to the medical opinion of her treating physicians. (Dkt. 17 at 21-25.)

The Court addresses each argument below.

## A.    Whether the ALJ's Determination that Plaintiff Has the Ability to Perform Light Work Is Supported by Substantial Evidence

Plaintiff argues that the ALJ violated Social Security Ruling ("SSR") 96-8p for falling to include a narrative discussion describing how the evidence supports each conclusion citing specific medical facts and non-medical evidence with respect to the light RFC, and instead making conclusory statements that he considered the administrative record as whole, including treating medical and other records showing that she was not markedly functionally impaired as of the date last insured.  (Dkt. 17 at 12.) In addition, Plaintiff argues that the substantial evidence in the record does not support

the light RFC given the evidence of neuropathy affecting her walking and stability.  (Dkt. 17 at 13.)

A claimant's RFC is what he or she can do despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. *See Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  *Id.* at 1217 (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); *see also Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("[T]he burden of persuasion to prove disability and demonstrate RFC remains on the claimant.").  The determination "that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner."  *Vossen*, 612 F.3d at 1015 (citations omitted).

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence."  *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.  *See Pearsall*, 274 F.3d at 1217; *see also Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (same) (citation omitted).  The Eighth Circuit has held that "a claimant's residual functional capacity is a medical question."  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  "[S]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  *Id.* (quotation marks and

citations omitted).  However, "there is no requirement that an RFC finding be supported

by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016)

(citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d

1086, 1092-93 (8th Cir. 2012)).  "Moreover, an ALJ's failure to cite specific evidence

does not indicate that such evidence was not considered."  *Wildman v. Astrue*, 596 F.3d

959, 966 (8th Cir. 2010) (citation omitted).

> **1.**     **Whether the ALJ Complied with the Requirements of SSR 96-8p**

First, the Court rejects Plaintiff's argument that the ALJ violated SSR 96-8p for

falling to include a narrative discussion describing how the evidence supports each

conclusion citing specific medical facts and non-medical evidence with respect to the

light RFC.  SSR 96-8p is the Social Security Ruling that sets forth the Social Security

Administration's policies and policy interpretations regarding the assessment of residual

functional capacity. In the section entitled "Narrative Discussion Requirements," it states

in relevant part that a residual functional capacity "must include a narrative discussion

describing how the evidence supports each conclusion, citing specific medical facts (e.g.,

laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR

96–8p, 1996 WL 374184, at*7 (S.S.A. July 2, 1996).  There is no requirement that an

ALJ follow each RFC limitation with a list of specific, supporting evidence.  *See Audrey*

*M.H. v. Berryhill,* No. 17-CV-4975 (ECW), 2019 WL 635584, at *9 (D. Minn. Feb. 14,

2019); *see also Wilfong v. Berryhill*, No. 4:17-CV-2747-SNLJ, 2018 WL 4489453, at *4

(E.D. Mo. Sept. 19, 2018); *Zorsch v. Berryhill*, 2018 WL 3493087 at *3 (W.D. Mo. Jul.

20, 2018); *Kimmel v. Berryhill*, Case No. 2:15–CV–83 NAB, 2017 WL 1105122 at *5

(E.D. Mo. Mar. 24, 2017). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes). In addition, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin,* 721 F.3d 521, 526–27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).

Here, the ALJ provided the required narrative by summarizing Plaintiff's treatment notes, the objective medical evidence of record, opinion evidence, Plaintiff's self-reported activities, and various credibility factors in assessing Plaintiff's RFC. Since the narrative plainly explains each conclusion by referencing evidence in the record, including an extensive discussion of the available medical evidence (R. 15-21), the RFC statement satisfies the requirements imposed by SSR 96-8p.

### 2.    Whether the Light RFC is supported by Substantial Evidence in Record as Whole

Plaintiff argues that in assessing her with a light RFC, the ALJ improperly characterized the neuropathy in her feet a mere nuisance, given that the record demonstrates that she continuously had problems with her legs and feet. (Dkt. 17 at 13.) With respect to the Plaintiff's neuropathy, the ALJ found as follows:

26

[F]rom the alleged onset date of January 15, 2012 through the date last insured of December 31, 2016, the claimant's severe impairments, multiple sclerosis, and remitted breast cancer status post chemotherapy with ongoing neuropathic pain, caused the claimant to have a physical residual functional capacity to perform no more than light work. This finding is consistent with the evidence overall, including the claimant's generally unremarkable clinical findings across multiple physical examinations. Physically, the claimant has multiple sclerosis and remitted breast cancer with post-chemotherapy neuropathic pain. Despite this, the claimant's gait is never disturbed for any period of greater than one year from the alleged onset date through the date last insured.

(R. 18.)

Light work under the Commissioner's regulations includes the following:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Here, the medical evidence relating to Plaintiff's neuropathy in her extremities supports the ALJ's light RFC for Plaintiff. As of February 2012, close to the onset date of the present claim for benefits, Plaintiff had tingling in her foot, yet denied at any point having weakness or coordination difficulties and her walking was never affected. (R. 538.) She felt well enough to travel to Mexico in March 2012. (R. 314.) Although Plaintiff represented in July 2012 that she felt numbness, tingling, and burning in her right lower leg and foot, she also represented that her balance and coordination had generally been good. (R. 329.) Throughout her appointments with her doctors during the

period of disability, the examinations of Plaintiff showed normal motor strength and an

unremarkable walking gait.  (*See*, *e.g.*, R. 416, 423, 430, 468-69, 476, 783, 766, 777, 789,

792, 799, 808, 1022.)  While she exhibited a mild antalgic gait during her physical

therapy sessions during a limited period between August 2012 to December 2012 (R.

662, 665, 668, 671, 674, 677, 680), this lasted only approximately four months, and she

herself reported close to this period that her balance and coordination had generally been

good despite numbness, tingling, and burning in her right leg and foot.[6]  (*See*, *e.g.*, R.

329.)

From January 2013 through March 2015, Plaintiff represented that although she

had experienced numbness, she did not have any trips or falls and professed to doing

well.  (*See*, *e.g.*, R. 422-23, 783-84, 780-81, 786, 788-89, 792, 794-95, 798-99.)  Indeed,

in April 2013, Plaintiff represented to her physical therapist that she had no limitations

with respect to sitting, standing, walking, or performing repetitive tasks.  (R. 684.)  Her

only limitations were related to sleeping and lying down due to headaches.  (R. 684.)

Plaintiff did report to her physical therapist on June 6, 2013, that muscle spasticity

affected her ability to walk, however, by June 17, 2013, Plaintiff reported improvement

---

[6]    Even to the extent that the antalgic gait amounted to a temporary restriction in her ability to engage in light work, the ALJ properly discounted the temporary restriction, especially given that the impaired gait only lasted approximately four months.  *See Daniel A. v. Saul*, No. 17-CV-4322 (ECW), 2019 WL 4306353, at *10 (D. Minn. Sept. 11, 2019) (citing *Espinoza v. Berryhill*, No. 18-CV-00315-MEH, 2018 WL 3829956, at *8 (D. Colo. Aug. 13, 2018) ("[T]he ALJ noted that this was a temporary restriction, which has little relevance to Mr. Espinoza's 'overall ability to function on a daily basis.' I agree with the ALJ that limited and temporary restrictions generally receive less weight.") (citations omitted); *see also* 42 U.S.C. § 423(d)(1)(A) (stating that an impairment must be expected to last at least twelve months).

with physical therapy and reported even taking long walks, albeit with soreness, and that she had made good progress by July 2013. (R. 719-20, 727-28, 734.)

In April 2014, a doctor's examination found Plaintiff to have normal hand strength and gait, despite Plaintiff claiming numbness in her right foot and loss of executive functioning. (R. 415-16.)

In June 2014, Plaintiff denied any musculoskeletal, immunological, or neurological problems to Dr. Glasow, and her exam showed that her foot, musculoskeletal, and neurological systems were all normal. (R. 422-23.) In January and April 2015, Plaintiff denied any musculoskeletal; immunological, or neurological problems to Dr. Glasow. (R. 429, 437-38.) Her foot, musculoskeletal, and neurological examinations were all normal. (R. 430, 437.)

As of January 8, 2015, it was noted that Plaintiff made the decision to not be on any disease-modifying therapy for her MS. (R. 476.) She did have an MRI of her brain done in October 2015, which was stable with no new lesions and no enhancing activity. (R. 476, 478.) Plaintiff represented that "overall she has been doing well." (R. 476, 776.) On September 2, 2015, Plaintiff represented that she had no limitations with respect to her ability to sit, stand, walk, or engaged in repetitive activities. (R. 736.)

In June 2016, Plaintiff obtained a new puppy that she claims she spent time caring for and walking. (R. 972.)

Starting in June 2016, after she had been denied disability benefits, Plaintiff began to note symptoms related to walking. (R. 985-86.) While she claimed to her physical therapist that as of July 12, 2016, she had fallen 5 times over the previous year, there is

29

no such record of falls in her treatment records with her doctors and by July 20, 2016, she

was reporting that she had even "hiked up north." (R. 994, 1002.) Moreover, Plaintiff

reported in July 2016 that she was going to the farmers' market on a weekly basis and

had scheduled social events. (R. 981.)

In sum, this evidence leads the Court to find that substantial evidence in the record

as a whole supports the ALJ's exertional light RFC during the relevant period in

question. There is no dispute that Plaintiff was suffering from neuropathy and muscle

spasticity during the period she was insured, however, substantial evidence supports the

ALJ's finding that Plaintiff was able to stand and walk as required in order to adequately

perform work with a light RFC. To the extent Plaintiff has cited some evidence in

support of her contention that the RFC was incorrect, "substantial evidence to the

contrary allowed the ALJ to make an informed decision." *Byes v. Astrue*, 687 F.3d 913,

917 (8th Cir. 2012). The Court will not reverse the Commissioner even if, sitting as

finder of fact, it would have reached a contrary result, as "[a]n administrative decision is

not subject to reversal merely because substantial evidence would have supported an

opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

**3.    Whether the ALJ Properly Considered Plaintiff's Complaints of Fatigue and Neuropathy in Conjunction with Her Other limitations in Propounding a Light RFC**

Plaintiff argues that the ALJ failed to comply with SSR 16-3p because he failed to

discuss the effects of fatigue in addition to her neuropathy on her ability to walk or stand

for six hours a day to any extent in his decision. (Dkt. 17 at 14-16.)

As set forth above, the Commissioner must determine a Plaintiff's RFC based on all of the relevant evidence, including her own description of her limitations. *See Myers*, 721 F.3d at 527. An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); SSR 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016)[7] (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms); *see also Noerper v. Saul, No. 18-3418*, --- F.3d ----, 2020 WL 3815961, at *4 n.3 (8th Cir. July 8, 2020) ("SSR 16-3p applies to Noerper's case, but it largely changes terminology rather than the substantive analysis to be applied.") However, the ALJ need not explicitly discuss each factor. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

With respect to Plaintiff's claim that the ALJ never undertook step two of the assessment for subjective complaints of fatigue pursuant to SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017), this claim is without merit. The ALJ specifically found that while Plaintiff's impairments could reasonably cause the level of fatigue claimed by

---

[7]     SSR 16-3p became effective on March 28, 2016 and supersedes SSR 96-7p. SSR 16-3p eliminates the use of the term "credibility" from the Social Security Administration's sub-regulatory policy, as the regulations do not use this term. In doing so, the Social Security Administration clarifies that subjective symptom evaluation is not an examination of an individual's character. Instead, the Social Security Administration will more closely follow the regulatory language regarding symptom evaluation." *Barbara M. v. Saul*, No. 18-CV-1749 (TNL), 2019 WL 4740093, at *7 n. 9 (D. Minn. Sept. 27, 2019) (cleaned up) (quoting *Krick v. Berryhill*, No. 16-cv-3782 (KMM), 2018 WL 1392400, at *7 n.14 (D. Minn. Mar. 19, 2018)).

Plaintiff, the claimant's allegations concerning the intensity, persistence, and functionally limiting effects of the symptoms experienced from the alleged onset date of January 15, 2012 through the date last insured of December 31, 2016 are not generally consistent with the administrative record taken as a whole.  (R. 17-18.)

Plaintiff notes that fatigue is one of the most common limiting symptoms of neurological disorders, such as MS.  (Dkt. 17 at 14.)  However, the issue is not whether Plaintiff's MS causes fatigue but whether Plaintiff's fatigue is disabling.  *See Blakeman v. Astrue*, 509 F.3d 878, 882 (8th Cir. 2007).  There is no dispute that the medical record supports the proposition that Plaintiff complained about her fatigue occurring at the onset of the claimed disability through the last date of insured.  (*See*, *e.g.*, R. 328, 792, 795, 786, 788, 808, 813, 818.)  However, despite these complaints of fatigue, there was little discussion regarding treatment for the fatigue that one would expect if the fatigue was as disabling Plaintiff claims.  Plaintiff was prescribed with a stimulating antidepressant, Fluoxetine, for her fatigue in November 2013.  (R. 792.)  It was not until April 2014, that Plaintiff complained that the Fluoxetine was not helping with her fatigue, at which time she was switched to amantadine, and she was told to contact her provider if the amantadine did not work so the providers could into prescribing her with a stimulant such as Ritalin or Adderall for her fatigue.  (R. 788-89.)  However, there is no mention after the prescription for amantadine that Plaintiff or her provider sought to switch her to a stimulant to deal with her claimed disabling fatigue.  Further, there is no evidence of any cognitive treatment related to energy issues, and Plaintiff does not dispute this fact.  (R. 69.)  In sum, Plaintiff's conservative treatment for her fatigue supports the ALJ's finding

that her complaints of disabling fatigue are inconsistent with her debilitating subjective complaint. *See Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (stating that "conservative treatments were inconsistent with" claims of disabling pain) history of conservative treatment reflected by the record). With respect to her neuropathy, again, while there is no dispute Plaintiff suffers from neuropathy, as set forth in Section IV.A.3 of the Report and Recommendation, *supra*, the objective medical evidence in the record does not support a finding that Plaintiff could not perform light work. *See Crawford v. Colvin*, 809 F.3d 404, 410 (8th Cir. 2015) ("[T]he symptoms [the claimant] attested to are inconsistent with the objective medical evidence found on the record, and hence, need not be given great weight when considered against objective medical evidence.") (citation omitted). Moreover, while the fatigue and neuropathy have at least in part been attributed to Plaintiff's MS, as of June 7, 2016, Plaintiff noted that she was not taking any medications for MS, and she testified that she was off her medication and would not go back on the medication unless she had a major flare-up. (R. 972.) Her decision to not take any medications and Plaintiff's conservative treatment is simply inconsistent with her claims of disabling fatigue and neuropathy.

In addition, "'where the alleged impairment is one of physical pain or excessive or chronic fatigue, the fact of engaging in daily activities that involve physical motion or exertion can be inconsistent with such severe impairments." *Joseph R. C. v. Berryhill*, No. 18-CV-456 (JRT/TNL), 2019 WL 720193, at *13 (D. Minn. Jan. 28, 2019), *R.&R. adopted sub nom.*, 2019 WL 722636 (D. Minn. Feb. 20, 2019) (quoting *Rodewald v. Astrue*, No. 08-cv-5911 (AJB), 2011 WL 13187192, at *14 n.4 (D. Minn. Mar. 4, 2011)

(citing cases)). Here, Plaintiff's fatigue and neuropathy did not stop her from going to Mexico for vacation in March 2012. (Tr. 314.) Plaintiff's daily activities also do not support her allegation of disabling fatigue and neuropathy. Although she claimed she needed to nap, the record shows that she was able to engage in a number of activities despite her disabling fatigue. She took long walks with her dog; walked and cared for her new puppy; walked at the zoo; exercised; she enjoyed going shopping; hiked; and saw her elderly mother and friends on a regular basis. (*See, e.g.*, R. 248, 250, 391, 403, 460, 649, 683, 720, 737, 972-973, 1002.) Even as late as April of 2016, Plaintiff admitted to socializing with small groups, went to the farmers' market and sporting events when she had the energy, and that she actually did these activities 1-3 times per week. (R. 232.) Although Plaintiff's husband noted that Plaintiff's daily activities were limited by her fatigue, he admitted that she was able to socialize regularly on a "daily/weekly" basis. (R. 251.) Further, despite her claims of disabling fatigue and foot neuropathy, she apparently believes she may safely drive a motor vehicle. (R. 42, 231.) As such, Plaintiff's daily activities are not consistent with her claim of disabling fatigue and neuropathy. *See, e.g., Martin v. Astrue*, No. 09-cv-1998 (RHK/JJG), 2010 WL 2787437, at *8 (D. Minn. June 7, 2018) ("Although she sleeps ten to fourteen hours a night and occasionally naps during the day, on good days, she is able to prepare meals, bake, do light housekeeping, shop, use a computer, travel, camp, cross-stitch, care for a puppy, run errands, go to birthday parties and the state fair, drive a car, eat at restaurants, and visit friends and family. These daily activities are not consistent with her claim of disabling fatigue."), *R.&R. adopted*, 2010 WL 2787435 (D. Minn. July 14, 2010).

The role of this Court when reviewing the Commissioner's final decision is "limited and deferential." *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam). Under the "deferential 'substantial evidence' standard," an ALJ's decision will be "affirm[ed] if a reasonable mind could accept the . . . decision." *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quotation marks and citation omitted). It is also important to note that ALJ did not outright disregard Plaintiff's cognitive difficulties, as evidenced by the fact that the ALJ limited her mental residual functional capacity to perform no more than simple routine tasks at a nonproduction pace. (R. 19.) What Plaintiff is essentially asking this Court to do is reweigh the evidence before the ALJ regarding the effects of her fatigue and neuropathy on her ability to perform the assigned RFC. However, a reviewing court "do[es] not reweigh the evidence." *Mabry v. Colvin*, 815 F.3d 386, 389 (8th Cir. 2016) (quotation marks and citation omitted). In sum, the Court finds that the ALJ gave proper weight to Plaintiff's complaints of pain and fatigue.

### 4.    Weight Given to Opinions Regarding to Plaintiff's Limitations

Plaintiff argues that the ALJ's decision to give little weight to her treating providers Dr. Beaver and Andrew Smith, M.D. is not supported by substantial evidence. (Dkt. 17 at 21.) The Commissioner counters that Dr. Beaver's opinion is inconsistent with the record and that Dr. Smith's restrictions only related to 2017 and after, his opinion was a conclusory checklist, and he was vague about any of Plaintiff's abilities with respect to walking and standing. (Dkt. 20 at 19-20.)

###### a.    The Weight Assigned to Medical Opinions

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.  An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight.  For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'"  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citation omitted).  "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions."  *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) ); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.' ") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted).  Moreover, "a treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability."  *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927(e)(1), (3)) (citation omitted)

###### b.    Weight Given to the Opinions of Dr. Beaver and Dr. Smith

Plaintiff relies on the following August 13, 2018 opinion from Dr. Beaver:

Sara is followed by me for her multiple sclerosis, I began seeing the patient in January 2012. I have been seeing her around every 6 months since that time. She does have multiple sclerosis that is confirmed by clinical laboratory findings including MRI. Prognosis - this is a slow, progressive, neurologic disease for which there is no cure. The patient does have issues with fatigue, walking and stability, numbness of the hands, burning pain, spasticity, extreme sensitivity to heat, depression, difficulty remembering, difficulty with problem solving, judgment, speech communication difficulties. The patient does not have persistent disorganization of motor function to extremities. She does not have fatigable muscle weakness. She has not had any recent exacerbations. The fatigue is best described as lassitude. It is typical of what is seen in multiple sclerosis. The emotional factors do not contribute to her fatigue. The patient has pain, fatigue, pretty much constantly. The patient is not capable of low stress jobs due to her difficulty with sustained attention, concentration, multitasking. The patient's impairments are expected to last greater than 12 months and the early state that these limitations took place would be 2012. Due to the issues outlined above, it is my belief that the patient would not be able to maintain sustained gainful employment due to the multiple issues as outlined above.

(R. 1154.)

On July 17, 2018, Dr. Smith filled a Multiple Sclerosis Residual Functional Capacity Questionnaire checklist. (R. 1149.) Dr. Smith noted that he had been treating Plaintiff for one year and three months. (R. 1149.) According to Dr. Smith, Plaintiff suffered from the following symptoms: fatigue, poor coordination, numbness, sensory disturbance, increased muscle tension, spasticity, pain, difficulty solving problems, and problems with judgment. (R. 1149.) Dr. Smith claimed that Plaintiff suffered from fatigue, but not the type that could qualify as lassitude. (R. 1150.) According to Dr. Smith, Plaintiff's pain and fatigue was severe enough to constantly interfere with attention and concentration. (R. 1150.) Dr. Smith believed that Plaintiff could not even tolerate low stress work. (R. 1150.) Dr. Smith believed that Plaintiff could walk four blocks without rest, but was "unsure" how long Plaintiff could sit, stand or walk. (R.

1152.)  He noted that Plaintiff did not need an assistive device like a cane to ambulate.

(R. 1152.)  He was also unable to provide an opinion with respect to any of Plaintiff's

other physical limitations outside of environmental limitations.  (R. 1152-53.)  Dr. Smith

noted that he believed that Plaintiff would be absent from work more than for times per

month.  (1153.)  According to Dr. Smith, 2017 was the earliest that his restrictions for

Plaintiff applied.  (R. 1153.)

With respect to the opinions of Dr. Beaver and Dr. Smith the ALJ found as

follows:

> Similarly, the medical source statements at Exhibits 24F and 25F are given
> little weight.  The author of Exhibit 24F had not even met the claimant as of
> the date last insured.  The opinion at Exhibit 25F was written by a provider
> who treated the claimant consistently but that opinion moves back and forth
> between reciting current symptoms and then opining that the limitations
> would have applied since 2012.  This is at odds with the evidence, as well
> as the assertion of medical fact in the opinion that the disease is progressive,
> so the opinion is also given little weight.

(R. 21.)

Based on a careful review of the record, the Court concludes that the ALJ gave

appropriate weight to the 2018 opinions of Dr. Beaver and Dr. Smith.  With respect to Dr.

Beaver's general assertions that Plaintiff had "issues" with walking and stability,

numbness of the hands, burning pain, and spasticity, the Court finds that although

Plaintiff may have suffered from these problems, Dr. Beaver's own treatment records are

inconsistent with the level of physical limitations that would have precluded her from

light work during the period of 12 months during the period that Plaintiff was insured.

Indeed, even starting on February 25, 2012, close in time to her MS episode, Plaintiff she

denied any weakness or coordination difficulties and stated that her walking was never

affected.  (R. 538.)  Moreover, in his treatment notes, Dr. Beaver found that Plaintiff's

walking gait was unremarkable and that she had normal strength in her motor strength

and extremities, no pronator drift, and no tripping or falls.  (R. 476, 538-39, 780-81, 783,

786, 776, 813, 1022.)  Moreover, for the reasons set forth in Section IV.A of this Report

and Recommendation, *supra,* the other objective medical evidence and her daily

activities as a whole are also inconsistent with any assertion by Dr. Beaver that Plaintiff

did not have the necessary motor strength, coordination, and balance necessary to engage

in light work for a period longer than 12 months during the period that she was insured.

Further, Dr. Beaver and Dr. Smith's opinions that Plaintiff's pain and fatigue

made her incapable of performing even low stress employment due to her difficulty with

attention and concentration due to her fatigue is inconsistent with objective medical

testing in the record during the relevant period.  While Plaintiff complained of difficulty

with attention and concentration due to her fatigue (R. 808), according to the examining

psychologists, her objective testing only showed a mild to moderate limitation in this area

during the period in question.  In June 2016, Dr. O'Regan found Plaintiff's capacity to

sustain attention and concentration to be mildly impaired as the result of her medical

condition.  (R. 975.)  During her July 2012 testing, Plaintiff's intelligence functioning

was estimated in the high average range and her overall attention span, including her

sustained attention, was average.  (R. 330.)  Her July 2016 testing showed that Plaintiff's

attention was variable.  (R. 982.)  Attention span was mildly impaired for her age and

divided attention was average.  (R. 982.)  Performance on a measure of distractibility was

average.  (R. 982.)  In addition, Dr. Beaver and Dr. Smith's opinions are undercut by the

conservative treatment of purported fatigue and Plaintiff's decision to not take medications for her MS.  (R.788-89, 792.)

Moreover, for the reasons set forth in Section IV.A.3 of this Report and Recommendation, *supra*, Dr. Beaver and Dr. Smith's reliance on Plaintiff's complaints of fatigue and pain on her ability to sustain attention and concentrate is not supported by her daily activities.  *See Fentress v. Berryhill*, 854 F.3d 1016, 1020-21 (8th Cir. 2017) (finding that if a treating physician's opinion is inconsistent with other substantial evidence, such as physical examinations or claimant's daily activities, the ALJ may discount or disregard the opinion); *Hacker v. Barnhart,* 459 F.3d 934, 938 (8th Cir. 2006) (discounting treating physician's opinion because it was inconsistent with claimant's daily activities and frequent admonition that she should exercise more often); SSR 96–2p, 1996 WL 374188, at *3 (July 2, 1996) (an ALJ may discount the opinion of a treating physician if it is inconsistent with the evidence in the record, including but not limited to the medical evidence and a claimant's own reported activities); *see also McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011) ("Finally, the ALJ noted that Dr. Puente's evaluation appeared to be based, at least in part, on McCoy's self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, Dr. Puente's report was rendered less credible.").

Accordingly, this Court concludes that the ALJ's assessment of Dr. Beaver and Dr. Smith's opinions of being at "odds with the evidence" and the respective weight

assigned to their opinions is supported by substantial evidence in the record as whole.[8]

5.    Conclusion

In sum, based on the evidence in the record as a whole, the Court finds that the ALJ's RFC is supported by substantial evidence. While there is evidence in the record supporting the limitations, substantial evidence in the record as a whole supports the ALJ's decision. *See Nash*, 907 F.3d at 1089 (quotation marks and citation omitted) ("If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.").

D.    Listing 11.09

The Commissioner's regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Such

---

[8]    The Court also agrees with the weight given by the ALJ to Dr. Smith given that he explicitly provided that his restriction for Plaintiff only pertained to 2017 and forward, outside of the last date of insured. *See Susan M. v. Comm'r of Soc. Sec.*, No. 1:18-CV-0623 (GTS), 2019 WL 2754480, at *6 (N.D.N.Y. July 2, 2019) (citations omitted) ("As an initial matter, the Court agrees with the ALJ that the April 22, 2017, opinion does not contain any indication that it is meant to apply prior to Plaintiff's date last insured of December 31, 2015, and therefore is of little probative value."). Similarly, Plaintiff claims that the ALJ also improperly gave little to no weight to the letters from Plaintiff's, husband, daughter, and friends regarding her limitations. (Dkt. 17 at 15-16.) The ALJ considered these opinions but gave them little weight because they were drafted in 2018, well after the last date of insured on December 31, 2016 and discuss current conditions. (R. 21.) The Court finds that the ALJ was not required to extrapolate from this later evidence that it portrayed an accurate picture of Plaintiff's condition on or before her date last insured. *See generally*, *Glenn B. v. Berryhill*, No. 5:18-CV-00341-MAA, 2019 WL 688205, at *5 (C.D. Cal. Feb. 19, 2019) (citing *Lair-Del Rio v. Astrue*, 380 F. App'x 694, 695 (9th Cir. 2010)). Nor does the Court find that these opinions are consistent with the record as a whole during the relevant time period.

41

conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P,

Appendix 1.  Plaintiff has the burden of proof to establish that her impairment meets or

equals a listing.  *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing

*Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990)).  "To establish equivalency, a claimant

must present medical findings equal in severity to all the criteria for the one, most

similar, listed impairment."  *Cronin v. Saul*, 945 F.3d 1062, 1067 (8th Cir. 2019) (citation

omitted).  Additionally, the impairment must have lasted at least one year in duration.  *Id.*

(citing 20 C.F.R. § 46.909).  "Merely being diagnosed with a condition named in a listing

and meeting some of the criteria will not qualify a claimant for presumptive disability

under the listing.  'An impairment that manifests only some of the listing criteria, no

matter how severely, does not qualify.'"  *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th

Cir. 2011) (cleaned up) (quoting *Sullivan*, 493 U.S. at 530).

Plaintiff argues that because Listing 11.00T recognizes that fatigue is one of the

most common limiting symptoms of neurological disorders, and Listing 11.00G(3) states

that you can have "marked" limitation in physical functioning with symptoms such as

pain or fatigue as documented in the medical record, the ALJ erred by failing to address

fatigue as part of the physical functioning under Listing 11.09.  (Dkt. 17 at 18-19.)  In

addition, Plaintiff argues that given that Plaintiff had a moderate limitation under three of

the mental functioning domains of Listing 12.02, Plaintiff's fatigue would cause Plaintiff

to be markedly impaired in at least three of the domains under 11.09B.  (Dkt. 17 at 19.)

To meet Listing 11.09B for MS, Plaintiff has the burden to prove the following:

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a),
and in one of the following:

1. Understanding, remembering, or applying information (see 11.00G3b(i)); or

2. Interacting with others (see 11.00G3b(ii)); or

3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.09B.[9]

With respect to a marked limitation in physical functioning, "a marked limitation means that, due to the signs and symptoms of your neurological disorder, you are seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities." *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00G(2)(a). A claimant may have a marked limitation in her physical functioning when a neurological disease, such as MS, "causes persistent or intermittent symptoms that affect [her] abilities to independently initiate, sustain, and complete work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity." *Id.* For the purposes of Listing 11.09, examples of physical functioning include

[S]pecific motor abilities, such as independently initiating, sustaining, and completing the following activities: Standing up from a seated position, balancing while standing or walking, or using both your upper extremities for fine and gross movements (see 11.00D). Physical functioning may also include functions of the body that support motor abilities, such as the abilities to see, breathe, and swallow (see 11.00E and 11.00F). Examples of when your limitation in seeing, breathing, or swallowing may, on its own, rise to a "marked" limitation include: Prolonged and uncorrectable double vision

---

[9]    Listing 12.02 contains similar domains for mental functioning. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.02.

causing difficulty with balance; prolonged difficulty breathing requiring the use of a prescribed assistive breathing device, such as a portable continuous positive airway pressure machine; or repeated instances, occurring at least weekly, of aspiration without causing aspiration pneumonia. Alternatively, you may have a combination of limitations due to your neurological disorder that together rise to a "marked" limitation in physical functioning. **We may also find that you have a "marked" limitation in this area if, for example, your symptoms, such as pain or fatigue (see 11.00T), as documented in your medical record, and caused by your neurological disorder or its treatment, seriously limit your ability to independently initiate, sustain, and complete these work-related motor functions, or the other physical functions or physiological processes that support those motor functions.** We may also find you seriously limited in an area if, while you retain some ability to perform the function, you are unable to do so consistently and on a sustained basis. The limitation in your physical functioning must last or be expected to last at least 12 months.

*See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00G(3) (emphasis added).

The Listings define a marked limitation in a mental functional area as being seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings in that mental functional area. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00G(2)(b). This definition of a marked limitation in a mental functional area for 11.09 is the same as the definition used when evaluating the mental disorder Listings, such as Listing 12.02. *Compare id* § 11.00G(2)(b), *with* § 12.00(F)(2),

As argued by Plaintiff, the Commissioner is required under the Listings to consider Plaintiff's fatigue in conjunction with her physical and mental limitations:

How do we consider symptoms of fatigue in these listings? Fatigue is one of the most common and limiting symptoms of some neurological disorders, such as multiple sclerosis, post-polio syndrome, and myasthenia gravis. These disorders may result in physical fatigue (lack of muscle strength) or mental fatigue (decreased awareness or attention). **When we evaluate your fatigue, we will consider the intensity, persistence, and effects of fatigue on your functioning. This may include information such as the clinical and laboratory data and other objective evidence concerning your neurological deficit, a description of fatigue considered characteristic of**

**your disorder, and information about your functioning. We consider the effects of physical fatigue on your ability to stand up, balance, walk, or perform fine and gross motor movements** using the criteria described in 11.00D. We consider the effects of physical and mental fatigue when we evaluate your physical and mental functioning described in 11.00G.

*See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00T(emphasis added).

Even to the extent that the ALJ did not explicitly discuss fatigue as part of his findings with respect to whether Plaintiff had a marked physical limitation for the purposes of 11.09B, in finding that Plaintiff did not meet the Listing, the failure to adequately explain his finding, let alone the failure to address a specific listing, "is not reversible error if the record supports the overall conclusion." *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) (citations omitted); *see also Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006); *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999) ("[A] deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."). As previously addressed, substantial evidence in the record, in the form of the objective medical evidence and Plaintiff's daily activities, supports a finding that Plaintiff did not have a marked physical limitation even taking her fatigue into account. (*See supra*, Section IV.A.3.) Moreover, while Plaintiff focuses on the importance of fatigue on her physical limitations, her own treating provider, Dr. Beaver, opined that her fatigue was not related to physical fatigue. (R. 1154.)

The Court also rejects Plaintiff's argument that because Plaintiff's fatigue should automatically increase one of the mental domains in 11.09(B) from moderate to marked. The ALJ concluded as follows:

In addition, with respect to the period under consideration, the severity of the claimant's mental impairment did not meet or medically equal the criteria of any of the mental listings, including listing 12.02. Nor were the "paragraph B" criteria of physical listings 11.09 and 11.14 met or medically equaled. In making this finding, I have considered whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, a severe impairment or severe combination of impairments must result in at least one extreme or two marked limitations in a broad area of functioning. These broad areas of functioning are as follows: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

(R. 14.) The ALJ went to find that Plaintiff had a moderate limitation, with respect to

understanding, remembering, or applying information; a mild limitation as it relates to

her ability to interact with others; a moderate limitation with regard to tasks dealing with

concentrating, persisting, or maintaining pace; and a moderate limitation to adapting or

managing herself. (R. 14-16.) These limitations are all supported by the objective

neuropsychological testing that Plaintiff underwent between 2012 and 2016, none of

which resulted in a limitation greater than moderate in any of these domains, and which

mostly found that Plaintiff had mild limitations. (R. 329-331, 974-76, 982-83.)

While not entirely clear, it also appears to be Plaintiff's argument that despite the

objective test results, the ALJ should have increased the level of limitation to marked

because they do not adequately reflect her claimed fatigue. This is reflected by her

reliance on ME's opinion with respect to Listing 12.02 to show that the ALJ erred in

reaching the conclusion that she did not meet Listing 11.09. (Dkt. 17 at 19-21.)

Specifically, Plaintiff asserts that because the ME did not take into account her fatigue

with respect to her opinions that Plaintiff had moderate limitation with respect to three of the domains—understanding, remembering, or applying information; tasks dealing with concentrating, persisting, or maintaining pace; and adapting or managing herself—then Plaintiff would necessarily need to be rated as marked as to one of these domains for the purposes of 12.02,[10] and by extension 11.09B, if her fatigue was properly taken into account. Plaintiff goes on to take issue with following finding of the ALJ regarding the testimony of the ME:

> At the hearing, the claimant's representative proposed increasing the ratings of the "paragraph B" criteria when evaluating the multiple sclerosis listing as compared to when evaluating listing 12.02. In other words, the theory of the claimant's representative was that the "paragraph B" ratings, when factoring in fatigue, ought to be the ratings assigned by the medical expert plus the additional effects of fatigue. I must respectfully reject the proposed method of interpreting the medical expert's testimony. Dr. Butler's testimony was clear that, in a tested capacity, the claimant's performance was pretty much within normal limits. Additionally, the medical expert was clear that the claimant did not carry any specific DSM-V diagnosis, for which the claimant was receiving ongoing treatment. Nevertheless, the medical expert went on to assign moderate limitations with respect to three of the four

---

[10]    Listing 12.02 is met or equaled when there is "[m]edical documentation of a significant cognitive decline from a prior level of functioning in one or more . . . cognitive areas" (the "A" criteria) accompanied by "[e]xtreme limitation of one, or marked limitation of two," area(s) of mental functioning (the "B" criteria). 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02A, B. The following "B" criteria "represent the areas of mental functioning a person uses in a work setting: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* § 12.00(A)(2)(b); *see id.* § 12.02B; *see also* 20 C.F.R. § 404.1520a(c)(3). The "B" criteria are rated on a five-point scale ranging from no limitation to extreme limitation. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00F(2); *see* 20 C.F.R. § 404.1520a(c)(4). Moderate limitation means the claimant's ability to function in that area "independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F(2)(c). The next point in increasing severity is "marked" limitation, meaning that functioning "is seriously limited." *Id.* § 12.00F(2)(d) (emphasis added). The next and most severe point is "extreme" limitation, which occurs when a claimant is "not able to function in th[e] area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00F(2)(e).

> "paragraph B" criteria.  Given that the minimal tested findings would not, alone, support the "paragraph B" limitations that I have found, I find that the ratings that the medical expert assigned already factor in the effects of fatigue.

(R. 16.)  In other words, the ALJ concluded that the objective testing of Plaintiff showed a lower level of limitations than were assigned by the ME and therefore already factored in the effects of Plaintiff's fatigue.

The ME testified that she had the opportunity to listen to all of Plaintiff's testimony, which would have included Plaintiff's testimony regarding her fatigue and the medical evidence.  (R. 64.)  In addition, the ME noted in her opinion that the record demonstrated that "some aspects of her cognitive functioning are worse when her multiple sclerosis symptoms are active" and that "there are difficulties with memory, difficulties with energy.  The things she's testified, certainly, to are reflected in the record."  (R. 66-67.)  Based on this information, the ME told the ALJ that she had enough information to evaluate the B criteria.  (R. 67.)  The ME went on to opine in relevant part as follows:

> A  I said, Your Honor, that the claimant's ability to understand, remember, and apply information was moderately impaired.  In the original neuropsychological evaluation, they noted difficulties with planning and organization, difficulties with problem solving -- this is at Exhibit 4-F.  The most significant thing from that evaluation, Your Honor, they said she'd have significant difficulty managing large complex tasks and that she would have difficulty organizing large amounts of information.
>
> At 10-F, 17, she was reported to manage her own medications.  At 16-F, 4, she remembered three of three objects immediately at 5 minutes; at 20 minutes, they said she was able to understand, remember, and follow only simple instructions. At Exhibit 17-F, they note that her memory had declined but still was within normal limits in many cases.

48

Again, though, her memory scores, though, Your Honor, ranged from above average to moderately impaired.

I said her ability to interact with others was mildly impaired. At 4-E, she reported socializing with her husband in small groups, one couple at a time, with her child, with family; said sometimes she went out to eat; sometimes to the farmers' market; sometimes to sporting events. That was noted again at Exhibit 7-E -- said sometimes couple once a week to breakfast. oh, she -- that they went with a couple once a week to breakfast.

At 16-F, 2, it said she visited her mother regularly; that she went to social events. As she testified to, she said it could be overstimulating and that sometimes it would leave her feeling tipsy or as they [sic] she were drunk -- said she had a couple of friends that she and her husband socialized with multiple times a week; said she had some friends she met for lunch. Said the claimant's ability to concentrate, maintain, persistence and pace was moderately impaired. At Exhibit 16-F, 2, said the claimant was walking and caring for a new puppy. They said her concentration was intact and said that was evidenced by her ability to compute serial threes. She computed serial sevens six places before making an error. She was able to do simple arithmetic.

They said she had a mild impairment in her ability to sustain attention and concentration, secondary to her medical condition, and that she'd have difficulty carrying out tasks with reasonable pace and persistence.

That, Your Honor, is noted in the consultative examination at 16-F, dated 6/7, of 2016, and, at the end of that note, it says that those conclusions expire 6/30, of 2016.

At Exhibit 10-F, 17, **they note lower energy, lower motivation**, though average attention and average sustained attention. And at 17-F, they note declined attention and motor function and processing speed.

I said the claimant's ability to adapt and manage herself was moderately impaired. At 16-F, 6, it said she would be unable to tolerate the stress and pressure of typical entry-level work. That note is dated 6/7, of 2016, with an expiration date of 6/30/2016.

(R. 67-69 (emphasis added).)  As part of her assessment, the ME relied on Dr. Holker's

neuropsychological examination of Plaintiff in July 2012 and 2016[11] (Exs. 4F, 10F, 17F)

and Dr. O'Regan's examination in June 2016 (Ex. 16F).  (R. 67-69.)  Dr. Holker noted in

her July 2012 examination that Plaintiff had significant issues with fatigue and

considered Plaintiff's concern regarding her fatigue and her need for naps.  (R. 459-60.)

In her 2016 evaluation and examination, Dr. Holker took into account the following with

respect to Plaintiff's mental functioning: "She is too tired or fatigued to do most of the

things that she used to do, and does not have enough energy to do very much.  She sleeps

most of the day."  (R. 982.)  Dr. O'Regan noted in his analysis of Plaintiff's ability to

function that Plaintiff reported extreme fatigue.  (R. 971.)  Plaintiff argues that the ALJ

agreed that fatigue was not included in the ME's assessment.  (Dkt. 17 at 20.)  However,

there is nothing in the exchange relied upon by Plaintiff that indicates that the ALJ agreed

that the ME's consideration of Plaintiff's mental functioning could not and would not

take into account Plaintiff's fatigue.  (R. 77-78.)  Indeed, the examinations and the

accompanying objective mental testing by the psychologists relied upon by the ME

(which assigned a lower level of limitation for the most part than the ME) took Plaintiff

as she was, with all impediments including her claims of fatigue.  To the extent that

Plaintiff argues that the testing relied upon by the ME is merely a brief snapshot, such an

argument would ignore the fact that it is her burden to prove that she meets Listing 11.09,

---

[11]    It is important to note that Plaintiff's medical provider for her MS, Dr. Beaver, referred Plaintiff to Dr. Holker for further characterization of any cognitive difficulties. (R. 328.)  In other words, the reports relied upon by the ME were created when Plaintiff's MS treating provider was trying to obtain guidance on how her condition affected her mental functioning.

and the cognitive testing took at least three hours, not including the interview.  (R. 462, 983.)  If Plaintiff was not fatigued enough for test results to show more than a moderate impairment on three separate dates during extensive cognitive testing, then that is further evidence that the fatigue is not as great of impediment to the domains in paragraph B of 11.09 as Plaintiff claims.

In any event, the Court finds that the ALJ's decision that Plaintiff had no more than moderate limitation as to the mental functioning domains of 11.09B, even taking into account her fatigue, to be supported by substantial evidence as set forth above by the ME and the various evaluations by psychologists relied upon by the ME.

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff Sara A.S.'s Motion for Summary Judgment (Dkt. 16) be **DENIED** and;

2.     Defendant Commissioner of Social Security Andrew Saul's Motion for Summary Judgment (Dkt. 18) be **GRANTED**.


DATED: July 30, 2020                          *s/Elizabeth Cowan Wright*
                                              ELIZABETH COWAN WRIGHT
                                              United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).